I understand that everyone is here. Accordingly, we will dispense with the calling of the calendar. We'll hear the first case, Deferio v. City of Syracuse. Good morning. May it please the court, my name is Nate Kellum and I represent the appellant, James Deferio, who comes to this court seeking meaningful relief, namely relief from Syracuse's permit zone policy that continues to inhibit his protected speech in a traditional public forum. As the district court concluded, Mr. Deferio has been deprived of his constitutional rights by virtue of his his rights being violated, not being able to speak in a public way. And the cause of this really relates to the policy of the City of Syracuse. What precisely is the policy that you contend is unconstitutional? Certainly. The policy is that Syracuse maintains a policy that allows permittees of public events on public property to have proprietary control over public ways, including public sidewalks, as described in geographic boundaries that they set out in their permits. This is the moving force behind the constitutional violations that Mr. Deferio suffered, because what happened in 2014 and also in 2015 was it was precisely because of this policy that he was not able to speak on the public way. Now what is your basis for saying that the city had this policy, the one that you've just described, about giving permittees, proprietary control over public areas? Certainly. It's shown in three different ways, in three different ways that the case law recognizes. One is an explicit writing that refers and reflects the policy. Second is ratification by officials who have decision-making authority, and that would be both the Chief of Police and Syracuse Corporate Council. And then third is by the custom and practice. First, as far as the writing, that's found on page 143 of the appendix. That's the Police Department Training Bulletin, which in it sets out that it's a policy that allows for permittees to obtain permits that will have city sidewalks within their control, and then it also instructs police officers that they are to recognize these boundaries and that they are to enforce these boundaries if necessary. This policy was also exhibited by the permits themselves. In 2014, it showed that the permittee, CNY Pride, was able to obtain a permit for a city sidewalk, although it was open to the public and although it was not even part of the festivities, they were able to obtain a permit for the city sidewalk and get exclusive use such that they could eject individuals. I don't know that I read the policy to give proprietary control, at least as set forth in the Training Bulletin. I mean, the Training Bulletin seems to be to say things like permits are required and describes the process for obtaining a permit and what officers are supposed to do to protect the public, etc. I mean, can you point me to where it says that, or the language that you're relying on? It's the language that deals with the boundaries, where it talks about enforcing the boundaries, and so that's where the geographic limits come into play. How does that, I mean, it says to enforce the designated boundaries of the permitted event, and you look at the permit as well, it seeks permission to use, for purposes of the public assembly, use the sidewalks, but I don't see anywhere where it suggests that the identify what shows that the permittee has the right and the police are to enforce the exclusion of the public from the permitted spaces? What's shown there is, and it's really a collective data from it, is that, I'm sorry, the data, what I'm referring to is, I guess, the context and backdrop of it, is you have a permit to use salt exclusive use, and the 2015 permit actually says exclusive use on it, on the permit itself. I'm looking at that, could you just, we request exclusive use of sound amplification, we request exclusive use of this location for access to the festival site for the setup time, that's what you're talking about, the handwritten? Yes, Your Honor, because what's being solved here, the reasons why, they say it's for amplification, for access, and so they want exclusive use, and they were granted that, and that's by pursuant of the police department training bulletin, which allows for limited purpose owning, isn't that correct? The use was exclusive, now as far as the purposes, it was limited, it is limited to amplification, is also limited to access, but that gave them exclusive use, and they utilize it, and that's exactly what happened on the scene on both 2015 and 2014, where both officers, it was Sergeant LoCastro in 2014, and Captain Sweeney in 2015, who both referred to the permit, they said, okay, we've been told that we have to enforce these permits, we look at the permit, 2014 includes the sidewalks, and so they have used it, 2015 is the same thing, they took a look at the permit, said, hey, we've been told we have to enforce the boundaries of the permit, and it shows 40 feet from the entrance on the public sidewalks, and so they enforced it, and so what you have is, you have permit users seeking exclusive use, you have the city granting the exclusive use, and then you have the police officers enforcing the exclusive use, so that happened in both 2014 and 2015. Is there anything in the training manual, the bulletin, that says that Syracuse has, what its language here means, is to exclude other people rather than to have the permitted assembly occur in this location. I mean, they're not mutually exclusive. I really don't know of any other way to interpret boundaries. If you're enforcing at the geographic limits of the permit, and you're enforcing those, and that's exactly what the police officers are doing. That's allowing the assembly, but that's not necessarily excluding members of the public in a public place. Well, if they enforce the boundaries, I don't know how else that would work out except to say, okay, this permittee has a space, we're enforcing these boundaries, we're going to mark those, we're going to put cones, we're going to put tape up, meaning that the permittee is able to use a space, but you cannot. Well, it could mean that the demonstration. I suppose that's possible. I suppose it could work both ways, but it certainly doesn't. I think what the point is, is that there are people who are allowed to use a permitted space, and there's folks who cannot. And so, it matters whether you fall within the geographic limits. And so, assuming the permit gave exclusive use, but where is there a policy or practice or pattern that sets forth the policy that you've articulated? Certainly. Okay, first... I don't see it in the training manual, but what else is there? Certainly. Thank you. Also, with ratification, the Chief of Police authored and he sponsored the training bulletin, but also you have Syracuse's Corporate Council, who specifically created the 40-foot buffer that was put in in 2015. And so, that's what Captain Sweeney was relying on was his conversation with Corporate Council in addition to the permit itself. But again, as Judge Chin was asking, what turns this into an established policy on behalf of the city and practice over time? Certainly. Ratification is one way in which it can be established. Also, if you look at U.S. Forest Customs policy, Your Honor, you have 2014 and 2015 where it was done, and then in 2013 even. It was not applied at that time, but interestingly, it reveals the policy because the permittee wanted to eject Mr. Deferio from the sidewalk, and what was said there is, well, your permit does not cover the sidewalk. And so, that omission was rectified in 2014 and 2015, but then also in 2016, it was entrenched and the evidence shows that that's exactly what the city was going to provide again was exclusive use. So, you have four consecutive years, and that establishes a custom in the practice. Any further questions? Thank you. Well, you have some time for rebuttal. We'll hear from the other side. Good morning, Your Honor. May it please the Court. My name is Todd Long. I'm an attorney, Assistant Corporation Counsel for the City of Syracuse, appellee in this case. I just want to reply to a few points before making a few brief points myself. As far as the Corporation Counsel creating a buffer zone, there's no buffer zone created by anybody within the City of Syracuse. If you look at the record, what essentially happened was there was an application in 2015 whereby the Central Permit Office had indicated that they believed that the application itself could abridge First Amendment rights, and therefore, there was a conscious effort to change that to limit it to something that's content-neutral. Now, the District Court had recognized that this maybe didn't go far enough in analyzing under intermediate scrutiny, as opposed to strict scrutiny in 2014. However, they Mr. White had acted essentially with the intentions of making this something that would be open for free speech. So I just want to address that issue. Second, an Assistant Corporation Counsel is not a policymaker. Assistant Corporation Counsel providing advice to a BEAT officer working to detail that day is providing legal counsel as to how he believes the permit should be interpreted. He himself did not direct a certain policy or create or craft the permit, which was requested by a third party. As to the 2016 bulletin, I can tell you as a bit of procedural history, that 2016 training bulletin happened after appellants had made their, filed their answer and made their motion for a preliminary injunction. The 2016 bulletin was a remedial effort to assuage the issues with respect to alleged vagaries in a due process violation allegation that Mr. DiPirio didn't understand what boundaries were as far as the festival, nor did the festival understand what boundaries were, and so it served a fixing this issue of whether or not there were enforceable boundaries to a park. And fundamentally what this comes down to with respect to a custom practice or policy with respect to a custom, it's clear in 2013 there was no constitutional violation. With respect to a city being able to provide permittees, proprietary control of a public space, not including the public for a slide from 2014-2015, this is the very function of a permitting process for any parade. This happens routinely and is protected in the police, in the city's right to police. Could you help me understand though, your adversary's point is that as reflected in the 2015 permit, that the permit gives exclusive use and the right to exclude members of the public from the space rather than designating an area for use by a large assembly of people, and the application does in fact refer to exclusive use. Does the grant of that application suggest a pattern or practice in the city of permitting to exclude members of the public? I would say no. When it was modified by Sam White, the intention wasn't to exclude members of the public. The intention was to exclude certain types of actions that are not related to speech or exclude members from that particular function of free speech, but rather sound amplification and the prevention of movement, ingress and egress into the festival. That was its explicit purpose just for the purposes of 2015. It does seem, looking at the granting of the 2015 permit, that it gives exclusive control to the permittee regarding access to the festival? The access, if you look at the deposition of Sam White and the intention of the access, it was for the purpose of not impeding ingress and access. Not so much for being in that area. What was its purpose? For preventing the impeding of ingress and access to the festival grounds, which had only one point of entry. It would not prevent somebody from being in that location and exercising free speech in the event they were not using a sound  device at all. I just wanted to make, do you have any further questions? I just wanted to make a few just very brief points. With respect to the events themselves, I think there's a stark difference between 2014 and 2015, and I believe the district court laid this out in applying two different forms of analyses with respect to the permit themselves. Applying strict scrutiny to speech on that public fora, whereas 2015 it applied intermediate scrutiny because there was an attempt to make the permit content neutral. I feel that there is also a lack of a policymaker decision evident here. Although the training bulletin which occurred subsequent to this event, also the 2016 event had not ripened, nor is it considered a part of this particular action itself. There is no individual policymaker identified, nor was Chief Frank Fowler deposed as to his role in a policymaking decision. As I mentioned before, the Assistant Corporation Counsel. Let me interrupt you. Yes. So exactly what does the record reflect the city's position to be in your view with regard to the sidewalks when a permit has been granted for public assembly in that area that would include the sidewalks? What are those sidewalks? What sidewalks are you talking about in 2014? I'm talking generally. If a permit is granted for public assembly and includes a sidewalk area, does the sidewalk still remain a public forum or does the permittee have any rights to exclude individuals and to call on the Syracuse police to assist in excluding individuals from those sidewalks? In the 2014 application, it does appear as if the request was to those sidewalks. As far as what the policy of the City of Syracuse is, you can see that there that was maybe isolated in 2014 as far as a granting of that permit, not at a policymaker level, but an individual who was in permit review. But subsequent to that, in 2015, there was clearly a move away from that and as it stands today, as we're in a period post-preliminary injunction, the city does not grant exclusive use of sidewalks as the perimeter of a public park. No exclusive grant? Correct. If I could just make one more brief point. It's just with respect to the issue of preliminary injunction becoming a permanent injunction. I believe the preliminary grant was with respect to the exclusive use of sidewalks at the perimeter of the Inner Harbor, which is a district court rightly slated a case from Florida talking about the use of an area where the same thing was happening there as far as a permanent injunction with respect to a specific park in a specific event. Here, there's no indication that in the future that particular park will be used in perpetuity by CMY Pride to hold their festivals and so a permanent injunction with respect to speech at that park with regarding that festival would not be a remedy that would resolve the situation is not appropriate. Future CMY Pride festivals could be held within grass areas of a park that there is no sidewalk so I don't think that the extraordinary remedy of a permanent injunction would be appropriate under these circumstances. Let me ask another question, which is you've pointed to a number of expressions that your adversary has looked at as expressing the city's view including the Corporation Council's advice and so on and you've discounted them as expressing the city's view. What should we look at in your view as expressing the city's position on the treatment of sidewalks and the meaning of permits? Well as far as I'm concerned the city does as evidenced by 2015 when a permit request comes in there is scrutiny applied as to whether it abides by general legal constitutional standards and with conference to the Corporation Council on that. I believe it is my position to the city particularly now and moving forward that those areas are considered public fora. I'm asking what do we look to to determine what the city's policy is. Do we have to look at an array of permits that have been acted on over Do you agree that the training bulletin is a legitimate source of policy expression? I believe the training bulletin serves the function from the chief of police after the fact after the this particular case here of providing guidance as to specificity so as not to deprive the due process rights of individuals not knowing the boundaries of their festival. So that's a legitimate source? I would believe so yes. Okay thank you. If you have no further questions your honor we rest on our brief. Thank you. Thank you your honor. I believe what we do have ratification from the Corporate Council. I'm not really aware of a case that says with someone who's writing on behalf of the Corporate Council and their lawyer in that office that they do not have the authority. I believe that was the case in Pemba versus City of Cincinnati. It's a 1986 decision and also in Bible Believers versus Wayne County. It's a Sixth Circuit case. I believe has the same situation where we had a lawyer who was advising the police department and that's what the office of the Corporate Council does here. So I believe that's the Supreme Court standard I think is that you need a decision maker who possesses the final authority to establish municipal policy regarding patrol. Why is an assistant corporation counsel responding to circumstance of the moment a final decision maker for the city? Certainly because he when he writes a letter and he says he's doing on behalf of the city and on behalf of Corporate Council so he states that that's what he states in the letter and so I would think that Mr. Deferio would be able to count on that as far as policy. And if the actual Corporation Council walked away from that statement then you'd have a different point of view. I would and if there was an affidavit that the Corporate Council stated that in this case I don't believe we'd have an argument there but we don't. Before you sit down, let me have you back up and be sure I understand the core First Amendment issue here. I mean let's say for example lots of public parks, Rock Creek Park, any number of them provide lots that you can reserve for a softball game or family gathering or anything like that. Suppose the plan rented a lot, reserved a lot, and some group, pick a group, Black Lives Matter wanted to confront them, infiltrate the picnic area or confront them about views. Could not the authority, the park authority, or the town or village take appropriate steps to keep them separate, consistent with the First Amendment? I think they could keep them separate. I think it would depend on whether the event is open to the public or it's closed like if it's a picnic of a family reunion or something of that nature or it's a wedding that would be closed. A lot of these type of events are open but also I think something that would be important here is that Mr. DeFaria wasn't actually within the area of the festivities themselves but bordering sidewalk and that's exactly where I think, yeah, that's where that's exactly where I think the Supreme Court and this court has recognized as appropriate for counterspeech. Am I correct in understanding that in 2016-2017 the following years there were no incidents? A preliminary injunction was in place but there was actually a preliminary injunction stopped it. And where did he actually protested in those times? On the sidewalk that he sought. Not across the street? Not across the street. Thank you. Thank you, Your Honor. Thank you. Thank you. We'll reserve decision. We'll hear the next case in In Re Express Scripts Holdings. Good morning. May it please the court. Salvatore Graziano for plaintiff TIAA. Your Honor, plaintiff's complaints in this action contain an extraordinary amount of detail that revealed the true behind-the-scenes disputes between Express Scripts and its largest, most important client, Anthem. Contrary to 10B's securities fraud case, these companies were locked in a massive $15 billion dispute. They were not engaging in discussions at all. It was error. Before we proceed, can I interrupt for a second? You've characterized this as a $15 billion dispute but I had difficulty placing that in the context of what's a huge contract over time. Can you describe what the deal was worth on an annual basis over the 10-year course of the contract? I think the best way to look at the magnitude of the deal is to look at Express Scripts admission at the end of the class period. That if they would have given Anthem the $3 billion per year discount that Anthem was seeking, they would have been losing money on this contract. Can you please give me an idea of the amount of money that was, that each year was worth? Sure. I don't have that committed to memory but it's in the complaint and what I'm saying to the court is that Express Scripts wasn't even earning $3 billion in profit per year. You can't answer my question. I can try to find it in the pleading, absolutely. There were figures about revenues plus profits related to it and a $15 billion swing is a large swing over, it's a large number period but context is helpful. Sure and in terms of context, this was the largest customer of Express Scripts. It represented as much as one-third of their profits. So if we take the Anthem request and we eliminate the profit on the contract, we get the company losing. So in terms of the Anthem related revenues in 2013 through 2016, we're talking between 12 and 17 billion of revenues per year from Anthem on this contract to Express Scripts. So $3 billion off of 12 billion is a material number but the materiality I think has to be tied to the profits because the profits here were one-third of EBITDA for Express Scripts per year on this contract. So this was a very, very significant event. There's another way we know the significance of this event because when Anthem went public with the $3 billion per year request, that revealed something to Wall Street that Wall Street didn't know and the stock price reflects that as well. Maybe you could turn to a different question which is, I had difficulty understanding, I mean this read to me more like a 1933 Act than a 1934 Act complaint because you point to different allegations, you make different allegations about false statements that were false at different points along in the class period. But it wasn't clear to me what rule you were espousing, at what point this became a fraudulent scheme with Scienter and with loss causation and so on, which is kind of a floating, you know, these false statements were made about how negotiations were going and how strong the relationship was between Anthem and Express Scripts. So, you know, at what point was there an affirmative obligation to disclose? Are you saying more primarily that to the extent any public statements were made, they were on one or more occasions inaccurate and therefore that reflected a 10b-5 violation? Yes, at all times this was a 10b-5 violation. From the very first statements in the class period in February, there were statements made that were misleading, that omitted material facts. So let's take them one at a time because I think it would be very helpful to answer your question. In February, Express Scripts came out and talked about how great the relationship was, how very, very solid it was. They hadn't been talking for four months by that time. Did they have an affirmative obligation to disclose in the course of these complicated negotiations with a huge client? I mean, that seems contrary to the interests of investors. You don't want to skew the actual negotiations. They absolutely could have declined to comments, but that's not what they did. They made selective comments, making it seem as if everything was going well in this negotiation. They called the negotiation productive. They called it current. By the time of the first statement, they hadn't been speaking for four months. By the time of the second statement, they hadn't been speaking for six months. By the time of December, when they said they were excited to keep going with the current productive negotiation, they hadn't been speaking for over a year. So this was a very hostile, locked dispute. What benefit would there have been to investors over the whole class period for them to announce that they were having unproductive negotiations with Anthem? Okay, so Wall Street was very specifically focused on this contract, and it was trying to project if the contract was going to be renewed beyond the 10-year term. So there were analysts that were making specific earnings estimates, especially because this is one-third of the profits of the company. How much is this contract going to be worth to Express Scripts after the end of the first term? So the analysts would ring up Anthem every quarter. They would say, how are your relations going with Anthem, your most important client? I'm sure it's great. And instead of being honest or refusing to answer, Express Scripts actually played along and created this false situation. With respect to the first pricing negotiation, it was a difficult negotiation, but in the end they worked out something. These allegedly false statements of things are great, very, very solid, why aren't those statements of puffery or wishful thinking and the kinds of statements that we've held do not support a securities fraud claim? To say negotiations are productive when they're non-existent really should not be dismissed away as puffery. To allow accounting for a contract that has an assumed five-year term built into it beyond the 10-year contract is misleading, and it's a violation of both GAAP and the securities law. You've got a period of time to negotiate this, and there were also statements along the way that, in essence, saying we can't guarantee that we will resolve this, but we are trying. Well, you know, if they would have said we are trying, that would be one thing. But what they said is we are engaged in good relationship with Anthem, our relationship is very, very solid, it is business as usual. So, Your Honor, respectfully, if they would have said we're trying and we don't know and we're going to account for this contract during its 10-year term, I would agree with you. Instead, they accounted for this contract not for the 10-year term, but as if it would be renewed for another five years, and they did everything to create the appearance to investors. And we see this because when they speak, the complaint is replete with analysts picking up on what they're saying and using it for their forecasting. This is one-third of their profits. Did PwC ever issue a qualified opinion? PwC issued an annual opinion, but there is no evidence at this point in the case that PwC knew what was going on in this bitter negotiation. There's absolutely no evidence that the back-and-forth where these parties are refusing to speak to each other was made aware of. Didn't they have to sign off on its conformance to GAAP, on the financial statement's conformance to GAAP? Yes, but that doesn't mean they were privy. And didn't that include the reasonable probability about the 15-year duration and value of the contract? The SEC asked about the 15-year contract at the very inception. They told the SEC it's based on a high probability that the contract would be renewed for at least five more years. We have no reason at this point... Did GAAP require a high probability? GAAP required at least a probability likelihood that it would... GAAP required each quarter for them to What their investors understood from their statements to the SEC that were public is they were basing it on a high probability. They said this was the most probable outcome. GAAP required that this be assessed for the most likely outcome each quarter. And there is... it is inconceivable that by the December of 2015, when they have not even negotiated for over a year since the demand was made in October of 2014, that they continue to account for this as if it can't even agree on the pricing in the original contract, but they're accounting for it as if it's been renewed for another five years. The reaction of Wall Street is quite revealing in this situation. When Anthem goes public, and not Express Scripts, by the way, and talks about the nature of this dispute, there are four days of statistically significant declines in the face of quite a shock by Wall Street as to what's happening here. When the complaint goes public, we have the back-and-forth detail of what was happening, and that again leads to a statistically significant reaction. Thank you. Good morning. May it please the Court. Scott Mussoff from Skadden Arps on behalf of the Appellee Defendants. Just to answer your question, Judge Carney, about the revenue. Between 2012 and 2016, it ranged from about $13 billion per year in revenue to $17 billion a year in revenue. And with EBITDA going above a billion in some places, and several billion to hundreds of millions of dollars in earnings, it's a complicated structure in terms of how you calculate revenue and you're talking about that size of a magnitude. I also think, Judge Carney, your point about it seeming like a 33 Act case, because the briefing and the complaint starts with some duty to disclose. And then when we discuss, and as we noted in our 28-J letter yesterday, that the courts within this circuit and the affirmance last week of Judge Sullivan's decision in Federal Gas says there is no duty to disclose the status of ongoing negotiations. In fact, the case they primarily rely on, Judge McMahon's decision in High Crush, she herself dismisses the earlier Section 11 claims there because even though there were bullish statements about the relationship, that the customer relationship was strained, that they were accused of breaches there, she dismisses those saying there's no duty to disclose breaches unless the relationship itself is at risk. So let's break down the class period. Let's go back to the very beginning. My friend says, let's look at the February 2015 statements. Well, what does Mr. Queller, a senior vice president of sales, in an oral statement at an investor day, this is how they begin their class period, not with a statement in one of the SEC filings, but an oral statement made at investor day, where Mr. Queller says, I know ANTHA made mention about contract negotiation, we're not going to talk about that. I don't think it's appropriate to talk in public about the negotiations, but he says the relationship is very, very solid. We're helping them roll out new states with Amerigroup and it's business as usual. We're working with them very, very closely. If you could skip forward, actually, you know, accepting your position that there was no duty to disclose, nonetheless, representatives of Express Scripts went forward and described the course of negotiations. In December 22nd of 2015, in particular, there were representations made that this was very early on and they were continuing productive discussions, whereas in fact they've been stonewalling since March. Why isn't that an actionable misstatement? Judge Carney, first, and go back to Mr. Paz's remarks, where they say we're currently in discussions. He says we're currently in discussions with ANTHACOM regarding the periodic pricing provisions. That's at A-412. ANTHAM itself, in January of 2016, after these statements, and this is on pages A-568-69 and A-553, the General Counsel of ANTHAM tells its shareholders we remain in dialogue. And then again on January 27th, 2016, the CEO of ANTHAM says the dialogue will continue and we're hopeful that still in 2016 we will reach a resolution to this matter that we are engaged with ESI. That's ANTHAM. But I thought the record showed that ANTHAM had been reaching out to Express and getting no response in January of 2016. Is that wrong? With all due respect, Your Honor, I think those are pejorative characterizations of a negotiation that doesn't go well. Plaintiff's complaint says Express Scripts didn't engage. There were multiple meetings. They're claiming they didn't engage because they didn't accept the $3 billion demand being made on them, when ANTHAM throughout the entire class period is telling their shareholders we're only looking to get about $500 to $700 million a year in savings, which would have potentially gotten a deal done. In their negotiations, they're starting with $3 billion. But to sit here and say there was no engagement is not true. In fact, throughout 2015, ANTHAM themselves on page 489 says they're optimistic they're going to get something done. On 515, we remain on track. A515, that's July 2015. In September of 2015, ANTHAM at A532 says we're hoping to finalize negotiations and conclude in a way that captures, we've made this public, something in the order of $500 to $700 million a year. So throughout this class period, ANTHAM's saying that. But what is the statements again that Mr. Paz makes? We're currently in discussions consistent with what ANTHAM's telling its shareholders. We're excited to continue productive discussions with ANTHAM. But then he says based on the range of variables that could influence our discussions with ANTHAM, we are unable to provide a timetable or the likely financial terms of a successful negotiation. And then the early on statement is Mr. Wentworth, CEO, in a Q&A, again in an oral response to a question, when asked whether ANTHAM was reflected in the 2016 guidance, he says it was not included in the guidance because we're very early on in the process and we're working our way through it. So there's just too many variables at this juncture. Weren't they already a year into it? Yeah, but they don't know where it's going to end up. That's the point. So they're telling their investors, we don't know, there's so many variables that go into this, we can't estimate any of the financial impact. And by the way, In February, the relationship was not very, very solid, was it? In February of 2015, this is a year, the very, very solid comment was made a year before the impasse. And what they're talking about in the very, very solid, he I'm talking about 2015 on A221, 175 million claims a year they're processing, 130,000 fully insured groups. I believe the revenue we discussed for 2015 was $16.6 billion a year. They're saying we're working closely with this company and just like in federal gas, it was an important enough relationship that they were confident that they would try and reach a resolution. And again, this is a And I think plaintiffs do a lot of that. They take events from the end and then use the statements that were made at the beginning. Because what's made a year later in February of 2016, and this may be one of the most egregious examples of taking a statement out of context, there's a risk factor contained in Express Scripts 2015-10-K that's issued on February 16, 2016. This is following a saying, the dialogue's continuing, what's the risk factor? While we are actively engaged in good faith discussions with Anthem and intend to comply with the requirements of the agreement, Anthem has made public statements threatening litigation. At this time, we are unable to provide a timetable or an estimate as to the potential outcome of these events, any of which could result in a material adverse effect on our business and our result of operations. So what do plaintiffs say? They say in February of 2016, you told the public you are actively engaged in good faith discussions, and that's false and misleading. But when you read the statement, they say, well, we're engaged in these discussions. They have a meeting set up in a few weeks. They had a mediation in November. They say, well, we're still engaged in these discussions. They're threatening us with litigation. Any of these outcomes could have a material adverse effect. What are we to make, though, of the fact that Anthem had already served, expressed with notice of operational breaches? At least, at least once. I think that goes back to the discussion of the decisions, including from last week, the affirmance of feral gas, that distinguish high crush from this situation. Notices of operational breaches do not need to be disclosed. It is time-recognized in business. Judge Pauly, in the river-bent birch case, you know, if there's not imminent litigation, if it's not relationship, and even Judge McMahon's decision in high crush says the same thing. These types of operational breaches go back and forth throughout. But you're talking about over a year before they even threatened litigation. So again, the operational breaches, we would argue there's nothing in the complaint to allege the magnitude of them, nothing to allege that they couldn't have been cured. Instead, they take Anthem's post-class period, end-of-class period complaint, with all of its unadjudicated allegations, and try and bring them forward a year and a half. Notice it's a trigger, a further negotiation process. Is that right? Yes. Yes, Judge Chin. The pricing mechanism, all it requires is a periodic period where you're supposed to sit down, no obligation, but to sit down in good faith, and negotiate repricing. Your friend also points out that, or makes the argument that the fact that Mr. Paz described the $15 billion concession as ludicrous, and yet that was Anthem's continued position over the course of more than a year, also makes it misleading to have described the negotiations when speaking up about them as ongoing, productive, and in good faith. There's been no movement. Judge Carney, Anthem is publicly saying what they're looking for is $500 to $700 million a year. That's what they're telling their public shareholders in their SEC filings and otherwise. The fact that in a contract negotiation they're starting at $15 billion is not only ludicrous, but it doesn't suggest that with these multiple meetings that they may not be productive. With all due respect to my friend, I've been in many mediations with this firm where their resolution, so it doesn't necessarily mean, I'm sorry, may I finish the answer? So I think that's important, and then I'll just conclude with the gap violation. These are very subjective gap requirements. They themselves are subject to Santa Fe, where Judge Carney and Judge Parker wrote that opinion, and fate, and all sorts of things. And again, on page, and I'll conclude with this, on page A755 to 756, what plaintiffs leave out of the original SEC letter, even though that's well before the class period, is even there, Anthem says, we do not know with certainty that this contract will be renewed, or if renewed, what the exact length of the new contract will be. And therefore, they use a probability-adjusted measurement. They never say there's a high probability it's going to be five years. With that, we'll rest on our papers for the Yes, thank you. The district court's summary of the facts in this case was actually quite accurate in terms of summarizing what was in the complaint, but then the district court shifted from the facts at issue here, the very specific facts, to a more general question as to when do you have to disclose the dispute with the customer. I urge this court, take the facts as true. They're well sourced. They're sourced to both Anthem's complaint, but as well as Express Script's answer and counterclaim. Compare those facts to what Express Script's answer. Therein lies the fraud in this case. Four months had gone by before the first class period statement when Express Script's called the relationship great, very, very solid. They had not been negotiating. And what do you point to in your allegations to suggest that the people making those statements didn't actually believe them, or weren't actually optimistic about concluding a favorable agreement with Anthem? Sure. Well, first of all, they could have been optimistic about concluding a favorable agreement, fine, but they could not be investors as to what was going on at the time. That is my point. What are the facts that they knew? They were directly copied in correspondence. This was the, this, even the district court agreed was a core important contract to the company. They were all aware of it. They were negotiating. Their names were in the, were in the emails. They were at the meetings. Anthem said to Express Script's, as late as December 2nd, you haven't even made a single counter to us. You haven't even responded to our demand going back to October of 2014. What about the disclosures that counsel just referred to where the company said, we don't know if there will be a contract. We're unable to predict. Don't those statements take away a lot of what you're arguing? Right. I don't think they do for two separate reasons. So, so, so first, imagine a scenario where a company says, we don't know what's going to happen. That's what this case is about. They were not talking to each other at all. What about the statements from Anthem saying we are negotiating? Right. If you look at Anthem's. Problems with trying to conduct a negotiation through public statements when you're doing it for certain reasons, both sides, but, but there, there are multiple indications from Anthem publicly that it is negotiating. That is not true, Your Honor. Anthem says we have been trying to get them to engage for a long time. We have been unable to. The general counsel of Anthem says, what do I do? They won't respond to my demand. I guess I'll go to litigation. And he says that in January of 2016. Anthem is not saying that they're negotiating or they're successfully negotiating. If Anthem was telling its investors it was looking for less, five to 700 million a year, there is no evidence that Express Scripts used that information with Anthem to say, okay, will you take the five or 700 million a year instead of three billion? There is no evidence of that in the record. Moreover, I want to make this second point, which is Express Scripts' counterclaim says that Anthem behaved in bad faith. Anthem rejected five offers. Is it true that Anthem told its shareholders that 500 million would do it? Yes. But there is no evidence that Express Scripts seized on that to negotiate. They were not negotiating. Both Express Scripts and Anthem agree there was no negotiation over that number. But the second point I wanted to make in response to Your Honor's question is the accounting here also required them to take a look at the accounting each quarter. They were accounting for this contract not based on its 10-year term, but they were spreading out the costs over a 15-year term. There was no valid basis for them to do that under GAAP unless there was a likelihood of an extension. They couldn't agree on prices on contract number one, but they were accounting as if there was going to be a contract number two. And that was false and misleading. And it was clearly what Wall Street was taking into account when they were looking at this company. Thank you. Thank you. We'll hear the next case, Holland Loader v. F. L. Smit. Good morning, Your Honors. May it please the Court. Mike Orella for Plaintiff Appellant, Holland Loader. The lower court held here that defendant intentionally failed to perform its contract with my client, Holland Loader. It also held that that breach, quote, shafted my client, Holland Loader, and swallowed up a proud American company. Yet Judge Woods then felt constrained by the proof and held that Holland Loader had failed to prove its damages with a reasonable degree of certainty. Now, there's only one issue that's presently before the Court on this appeal, and that issue is whether or not Holland has simply proven the fact of damages. F. L. S.'s position on appeal is that Holland has not even proven the fact of damages. Help me understand. What exactly was F. L. S. Smit getting from Holland? It got its entire business. It got products. It got its intellectual property. Well, let's start with products. Help me understand. They didn't seem to have any sales over an extended period of time. Your Honor, it's a... Ten years? Two or three products? So, Your Honor, over the last five years, immediately preceding the contract, there was $1.5 million in sales. And how many contracts was that? The number of contracts, Your Honor, is not in the record. There was a number of products. There was a refurbished loader. There were certain spare parts. But the context here is really important. There was only one loader, right, in ten years? So I'm focusing on the period five years before. There was certainly... I thought the record indicates for the prior ten years was only one sale of one loader. Is that right? Well, that's correct, Your Honor. Plus spare parts. Anything else? Well, Your Honor, the context here is really important. Remember, Holland Loader was a company in Colorado that was a one-man band. It was owned and operated by a single person, Mr. Svatek. Okay, we can get to the context, but let's be sure that we understand the quantity of products sold. One loader, spare parts, what else? One loader, spare parts, and I believe there was also some tractors and trailers. And the period I'm focused on is that it may be for the ten years prior, but certainly for the five years immediately preceding the contract, there was $1.5 million in sales. Now, again, for... And am I right that pursuant... This was called an intellectual property agreement that was the acquisition of the business, right? Correct, Your Honor. There was not a warehouse full of stuff or loaders, bi-directional or otherwise, that was transferred, right? It was patents and goodwill and ideas that were transferred, right? Correct. And there was also several trailers of spare parts that were transferred over. Yes. So the word product, the word product doesn't describe machines. It describes intellectual property that could turn into actual goods that could be sold. Is that right? That's correct. It was an intellectual property purchase agreement. So there was a number of products that had been developed that had been sold in the past. The intellectual property incorporated in those products were sold as part of this transaction. How do I... Were there patents? Correct, Your Honor. Yes. Yes. And so, again, the fact here, it's a very threshold issue, right? The threshold issue is whether or not my client has even proven the fact of damages. That's a low threshold, and we know that for three different reasons. If you look at this courts and the courts of appeal precedent, you look at Judge Wood's decision below, and you look at the facts, I respectfully submit that my client has proven the fact of damages. Now, how do you prove the fact of damages? All you need to do in FLS concedes is you have to prove some damages. That's all you need to do. If you look at the Tractable case, this court found that the plaintiff proved some damages when the defendant repudiated his contract. He failed to perform. He didn't buy certain energy. The Contemporary Mission case, also from this court, very, very similar to what happened here. This court held that there was a defendant who was supposed to promote the sale of products. The defendant didn't do that. FLS was supposed to promote the sale of the products. Judge Woods found that. FLS didn't do that. Am I right in understanding, though, that to create products that could be sold, that FLS would have had to spend substantial money to develop items, to bid on items? I mean, it didn't – we have these other breaches about failing to, you know, train the sales force and so on. But it wasn't as if there were items there kind of ready to sell. It had to invest in order to develop products that would be covered by the EIRMAP provision. Isn't that right? They certainly had to invest, Your Honor. But if you look at the deal memo – and the deal memo was drafted by an FLS executive for the board, was the basis of this deal – they say there's little work that needs to go into this here. There's already drawings. The products are synergistic with our existing products that we have. All we need to do is really update these drawings, spend a little bit of time, and we're off to the races. And the deal memo makes it very clear that there's very little work to be done here. They had been working with Mr. Svatek, who was the principal of Holland, for years. This was an actual question, right, the existence of damages? I believe that goes to a legal issue with de Noble, Your Honor, because the – Whether the plaintiff proved with reasonable certainty that it had, in fact, been damaged? I think the fact of damages, Your Honor, I believe is a legal question. And there's Second Circuit precedent that we cite in our brief that goes to that issue. Anytime you have an issue concerning damages, quantification of damages, that's a legal issue that's reviewed by this court de Noble. One other point, Your Honor, I see I only have two minutes left. I would assert that if you look at what this court did in the Rejcevich case, the Second Circuit case, that the wrongdoer rule comes into play there. And I would assert that this case is just like Rejcevich. This court held in that case when damages are at some unassertainable amount below an upper limit, and when the uncertainty arises from the defendant's wrong, the upper limit will be taken as the proper amount. Now, there's no dispute in that. Does the concept apply to the amount of damages as opposed to the fact of damages? Correct. That goes to the amount of damages. We don't even get there unless we agree that the fact of damages was proven? That's correct. I don't understand how the fact of damages is something other than the fact. Your Honor, you mean how do we show the fact of damages here? You said, and correct me if I'm wrong, I thought you were urging on us that the fact of damages is a legal conclusion. And my question for you is, how can the fact of damage be something other than a fact? Well, Your Honor, the Second Circuit cases we cite and are briefed go to the point where if you have any issues concerning damages, the amount of damages, the fact of damages, that's a de novo issue, I believe, Your Honor, that is reviewed by this court on a de novo basis. Is it a fact? I'm sorry? Is the fact of damage a fact or is it something else? Yes. No, I believe it's the fact of damages. Whether or not there's some injury at all is the proper threshold issue here, Your Honor. So if the judge below, and I admit this is somewhat of an unusual opinion, if the judge below finds, says, I find as a fact that this litigant suffered no damages, why isn't that subject to clear error review just like every other fact we look at? Well, because, again, Your Honor, it's a damages issue. And I think this Court has been very clear in the past that when you have issues that concern damages, those are issues that this Court looks at de novo. What basis was there, what reasonably certain basis was there for calculating damages in this case, do you think? You mean, Your Honor, once you get past the threshold issue, the fact of damages? So there are a number of things here that Judge Woods looked at with a reasonable certainty standard. Now, FLS admits that that's the wrong standard. We only had to satisfy the stable foundation. But if you look at in 2012, there's a deal memo. The deal memo says on a conservative basis, it values my client's property at $13.5 million. The problem with that is that Judge Woods seriously discounted that. He said that based on what he heard at trial, the purpose of that was to get internal approval and that it was essentially created for that purpose. That's correct, Your Honor. He discounted those figures. I mean, I'm not saying he rejected them, but he didn't give them much. Your Honor is exactly right. And that's exactly why the wrongdoer rule was created for this precise situation. It cannot be that the defendant can skew the numbers. Can you manufacture numbers? Can you manufacture projections and sales? He wasn't representing that to your client. He was representing that to a colleague in his business. And suppose he said, gee, I just love this deal. I think we're just going to break the bank with this. I can see us making millions and millions and millions of dollars over the next few years on this. Do you think that reasonably would peg the upper level of damages? I certainly believe, Your Honor, it provides a stable foundation for damages. And it's not just that. It's in 2012, 13, 14, 15. There are consistently numbers. In an internal document, and this is in the record, this is at JA 479, here's what two FLS senior executives are saying. This is three years into the earn-out period. They're talking about do these forecasts have any legs? Are they real? One executive says here, I think the Holland Products has some real possibility as no one has provided any engineering efforts since acquisition. Even one full-time employee focused on this may have a fairly quick effect. The $5 million for 2015 is backed up with some real data. They use the words backed up by real data three years into the earn-out period. Real data, I respectfully submit, is a stable foundation. We have missed opportunities. We have sales forecasts. We have R&D reports. We have documents where they're saying these are real prospects. We dropped the ball. Their words, not ours. There were folks coming to them throughout the earn-out period into 2017 wanting to buy our products, a $2 billion product. They say we dropped the ball. They point to what a competitor was doing with the same exact property that we had. It was a portable conveyor. And they say our competition has reached $500 million in one year. We had the same product. They did nothing with it. So I respectfully submit, Your Honor, that if you get to the quantification of damages, the record is certainly enough and sufficient to provide a stable foundation. But you don't even need to get there, Your Honor, because, again, provides that you accept the upper limit when the uncertainty is caused by the defendant. The problem here is there's absolutely no meaningful sales record here. They didn't sell anything. DuPont didn't sell anything of any consequence before the deal. And there's no ‑‑ you know, it's very difficult to make ‑‑ come up with any comparables. It wasn't really ‑‑ why wasn't this essentially a new business? Your Honor, this was, and when you talk about history of sales, this was his retirement ticket. There was no need for our client to be selling the bidirectional loader, the big products. $300,000 a year on average for the past five years for one person in Colorado is a substantial salary. He was only focused on spare parts. That's all he needed to do. This deal was supposed to be his golden ticket to retirement. This is a company with 50 subs worldwide, a worldwide selling force. He said, let me give you my intellectual property. I have deals all over the world I can't fulfill because I have capital constraints. You don't have capital constraints. But the contract they entered into was remarkably sketchy for something that was supposed to be a golden ticket to retirement. I mean, it just refers to commercially reasonable efforts in a general way. It affects the transfer of intellectual property, the patents. But commercially it didn't. We have said you have to expend a certain amount on R&D. You have to expend a certain amount on training. You have to develop it in this matter. And that matter was just very, very generic. And that, as the district court pointed out, makes it very difficult to, you may feel that these were not reasonable efforts overall or commercially reasonable because it required the input of significant capital to develop anything. You have a tough road to hoe, I think. Well, they had to use commercially reasonable efforts to develop a new product, a bidirectional loader, and they had to promote the sale of the products. As a new product, as Judge Parker is just pointing out, this is like a new business. Well, there was one new product, Your Honor. There was only one new product. It was the bidirectional loader. The other products, if you look at the deal memo here, if you look at the testimony, they say this is proven technology. These products have been in use for 25 years. But you hadn't sold any. How could it be proven technology? Well, the products had been sold going back. When my client took over the business, again, he was focused on spare parts because that's all he needed to do. That's all he needed for himself. But FLS concedes this was proven technology. They say in the record that we only need to do a little bit of work here to FLS-size these products. That's their term. We need to bring them up to our standards. This was not a complete, total redo. They were going to take all the products, FLS-size them, and continue selling them. You have two minutes for rebuttal. You're way over. I'm sorry, Your Honor. Thank you. Good morning, Your Honor. May it please the Court, Stephen M. Harnack for the appellee, FLS Schmidt. In this appeal, Holland has not cited a single case that is on point. In all of the cases on which Holland seeks to rely, the Court did not question the fact of damages, focusing instead only on the calculation of the amount. This is not such a case. Rather, this is a case where the Court found that there were no damages whatsoever. We submit that the closest case, indeed the case that is almost directly on point in respective damages, is this Court's decision in NES Financial v. J.P. Morgan, where this Court held, quote, the district court did not find that appellant had suffered damages of an indeterminate amount. It found that appellant had suffered either no damages at all, or that the possibility that it would suffer damages was speculative. You had an arrangement where you were going to take over and acquire intellectual property, and you were going to use best efforts or reasonable efforts to make the, to incorporate the property into products and sell them. And the judge found that notwithstanding those undertakings, you essentially did nothing. He used a pejorative we don't often use, but he said you just shafted him. Yes, Your Honor. And, you know, Your Honor, we agree with you in some respects that this was an unusual decision because he uses a lot of, Judge Woods did use a lot of, what should I say? Strong language. Strong language, yeah. But it's not supported by his own decision. I mean, he begins by saying that we took numerous steps, quote, to lay the groundwork for effective marketing of the acquired assets. That's at page 620. Then, my client got involved with New Zealand before they'd even signed the contract. They sent David Holland to New Zealand. When my friend, Mr. Rella, says today that it was just a matter of bringing in the products and they were ready to go, the fact was that those are— Did I hear you telling us that Judge Woods made findings of fact that are not supported in the record? Correct, Your Honor, yes. So, for instance, he says that we shafted them. He says that we dumped the New Zealand deal twice, maybe more. In the opinion itself, he justifies that we didn't bid on New Zealand. These were completely unrealistic timetables that they gave us. We had liquidated damages. You didn't cross-appeal. We did not cross-appeal because we—the case law doesn't provide for a cross-appeal where we won below on lack of damages. However, we have—we urged the court— Are you saying that he was wrong in terms of finding— We do, Your Honor. We do urge the court, and this is starting at page 16 of our brief, that the facts as found by the court do not justify the finding that we never intended to carry out the provisions of this contract. The court takes into consideration this historic downturn in the market. It mentions the Stop the Bleeding program. It finds that we— Nonetheless, the record seems to suggest that there were opportunities— there were inquiries received by your client about purchasing Holland Loader products, and those were not followed up on. And I didn't see any reflection or in what the district court wrote that some of the products that had been sold in the past were inadequate in any way. They had to undergo this FLS-izing process. But still, there was no training done, the district court seems to say, and that these sales opportunities could have been followed up on with minimal capital investment. Why doesn't that constitute a breach of the contract, as the district court found, to use commercially reasonable efforts to sell Holland products? Your Honor, that's a fair question. The record actually shows that we were communicating— this is a company that has 50 offices throughout the world. The U.S., Southeast Asia, India, South Africa, Indonesia, they were all communicating with one another. They were responding to inquiries that were coming in. They were getting support from the Spokane office. There's an important—and it's mentioned in our brief— that one—Mr. Furry, Willem Furry, testifies that FLS would be lucky if as much as one out of 100 inquiries turned into a sale. This is something where— Given the number of inquiries and the modest gap between where the products were that have been sold in the past, albeit not in the previous decade, why isn't it reasonable to presume some form of general damages in that context, given the breach and the repeated inquiries looking for— even if it's just one out of 100 inquiries that turned into a sale, these are multimillion-dollar items. Why isn't it reasonable to presume some kind of general damage? Well, so this gets really to the point that whether it's general damages or whether it's consequential damages, the inquiry is the same. It has to be tethered to the evidence, and it cannot be speculative. And as Judge Parker correctly noted, this was a case where you had one sale of a loader in 2002. But I'm pointing to evidence, and that's what I'd like you to explain. With all these inquiries in history prior to the 10 years of sales of products and the same intellectual property and the same patents and so on having been transferred, why weren't those inquiries a sign that sales could have been made? Well, I guess the best answer to that, Your Honor, is that there were no comparable sales during this entire period. We did not prevent Holland to go out with its expert or however it wanted to prove its damages to see what comparable products could have been sold during this period, this historic downturn. I mean, let me just remind the Court that not a competitor, but a major player in the same industry,  we were closing offices left and right. They could not identify one single sale of a comparable product during this entire period. In fact, the irony is that our expert found one sale, and that was related to the New Zealand deal, where the purchaser, in 2013, when FLS decided not to go forward with New Zealand, they then decided that they would either bid out again for a dozer trap or, well, as we understood, they were going to bid it out. Then in 2015, our expert finds out that they were still looking for a dozer trap, and then they built it themselves. So this is a case that's a little bit similar to Judge Hallwell's case and the Mium Matatu case that we cited. There's some argument, though, that every one of Judge Wood's findings of fact is valid. Explain to me how your adversary would not be entitled to $100 damages. Well, I mean, there are cases where you get $0.06, you get $1, you have nominal damages. I don't know if there's a particular distinction to be made between no damages and nominal damages. $1,000. But they don't get to the fact of damages because we've already prepaid them $350,000. We gave them a $350,000 advance. So the fact of damages doesn't even start until they've exhausted the $350,000, and this is precisely the same fact situation. Wasn't it incumbent on Judge Wood to determine whether some offset was required in view of the prepayment? Well, it never came to that. The only sales, and this is only brought up in the reply brief for the first time, the only sales were these spare parts. Now, these were all of $80,000 of spare parts translated under the formula. That came to all of $8,000. So my client overpaid for those spare parts 44 to 43.75 times for those spare parts. And I bring to Your Honor the uptick. But the difference is he said there were no damages. He didn't say there were less than $350,000 in damages. I think, Your Honor, he just didn't think that he didn't need to get into that because he just found there was no historical record. Their expert had not brought forward any evidence that during this period of time, no matter how much resource my client had devoted to this case, that they would have made a single sale. Let me point out. When were the spare parts sold? Sometime between 2012 and 2015. I don't have an exception. During the life of the contract. During the life of the contract, yeah. Why wasn't that a predicate for some damage? Because. It may not have been, you know, the magnitude they were thinking about, but that's different from no damages at all, which is what the judge said. Well, I don't know. He didn't reflect. Why isn't it reasonable that if they made $180,000 sale of spare parts with all of these worldwide resources, you could have made another one? Your Honor, maybe they could have made another one, but they only had $80,000. $80,000 or $80,000. Well, $80,000 of spare parts translates to $8,000 against the advance payment because it's 10%. You can write a dollar as a dollar. Yeah. I said no damages. What's wrong with that reasoning? You know, they only brought this up now for the first time on this appeal. It's something that they didn't bring to his attention. I get that, but let's hear your response on the substance. Well, my response is that I refer the court to upper deck at breakey, which would be the exact same. I mean, in this context, the exact same facts. Tell me why you think that would not be a predicate for some damage, and then you can refer us to precedent. Thank you, Your Honor. As I tried to express, the fact of damages does not come into play until you get to the first dollar above $350,000. So then the cradle paragraph of the opinion should have said something along the lines, he's already been paid $350,000, so he's not due any more. Yeah. I mean, I don't think that would have a bearing. He's not due the $8,000 because he's already been paid it, but that's not what the judge said. Right. Well, the appellant didn't even bring this up in the briefing. If I just have one second, I'll just respond to three points that were made by my friend, Mr. Rella. One is he mentioned something about $1.5 million in the last five years. I don't think there's anything in the record about sales of 1.5. He says that, Judge Carney, you would mention goodwill. Goodwill was not part of what was sold here. And what was the last point? That there were no meaningful sales. Just very quickly on the wrongdoer rule, I would just point to the Merck's case and the cap where the judge says no matter, even if you do look at a cap, even if you were to get wrongdoer rules, you still have to prove your damages, which they did not do. We'll rely on the brief. Thank you very much. Thank you. We'll hear the rebuttal. Thank you, Your Honor. Did you get license income from the patents that were exchanged, that were transferred? That's not in the record, Your Honor. There is no record of patent license income. And in the run-up to the transaction, was your client getting patent royalties from the patents? That's not in the record either, Your Honor. The only income, as I stated, and it is in the record, it's at JA-242, that there were $1.5 million in sales in the previous five years. What is being transferred other than your client's obligation to go to work and to try to make sales? So there were patents. There were designs. There were designs that he had drawn. Some were computerized. Some were not. They just had to be updated. There were spare parts. There was his idea for the bidirectional loader that they quantified as a $25 million product that he brought over and gave to FLS. So that's now an FLS product. Sorry, when you say they quantified, that's in the deal memo. That's not in the agreement itself. Isn't that correct? It's not in the agreement, but there are plenty of documents in the record, Your Honor, where they're doing projections and they're looking for R&D, and they say the price of that product, the bidirectional loader, will be $25 million. Now, that's Mr. Spahtek's idea. It's a novel idea. He brought that over to FLS, so now that's FLS's idea, and they can move forward and run with it. And FLS paid $750,000 for this transfer overall, right? They paid $700,000, Your Honor. And remember, Your Honor, an important point is in the deal memo, which was done by an FLS executive for the FLS board, was relied on and approved by the FLS board, they quantified it at a net present value analysis of the value of the property that was coming over and valued it at $13.5 million. This report said that the deal memo could not, the numbers could not be substantiated or justified. That's true. That's a finding of fact. But, Your Honor, that is true, but, again, that is precisely why the wrongdoer rule was created. You can't hold that against Holland, the fact that they're manufacturing. It's clear to me, at least, that that finding is clearly erroneous. Well, I mean, it's clear in the record that they manufactured the numbers. There's no question about that whatsoever. Why was it clearly erroneous, that finding? The fact that he made a finding that the deal memorandum lacked any established or reliable indicators of accuracy and that it could not be substantiated or justified. Why is that finding clearly erroneous? Well, because this was a year that had been negotiated for four years. There was plenty of data. They were asking my client for sales numbers, for product numbers, for margin numbers. And even a couple years later, there's 61 opportunities worth $150 million. There's plenty of emails where they're passing up on opportunities. The record is robust with respect to plenty of opportunities that they just passed up. So the fact that they're making these projections in a deal memo, they're actually borne out. If you look at all the opportunities, $150 million in opportunities, they only had to get a very small fraction of that and the $4 million earn-out would have been achieved here. And, again, with respect to calculating damages, you don't need to wade through the evidence because of Rasevich. And the last thing I'll say, Your Honor, just on the fact of damages, they cite one case in their brief. It's the J.P. Morgan case, the N.E.S. J.P. Morgan case. I would urge, Your Honors, if you juxtapose the language in that case with the language in Judge Woods' decision, it's very, very clear Judge Woods did not find that my client failed to show the fact of damages. How much damages are you urging us that your client failed to show? Well, the cap in the contract is $4 million. There was $350 paid, so it's $3.65 million, which, again, is the upper limit under Rasevich. So, again, J.P. Morgan, the only case they cite, the court there found that N.E.S.F. had suffered no damages at all. They hold that N.E.S.F. has offered insufficient evidence of any damages. Look at what Judge Woods does. He's struggling to quantify damages. He says there is insufficient evidence on the basis of which the court may calculate with sufficient certainty. He says the little historical data in evidence in connection with past sales of Holland Products also fails to provide a baseline by which to calculate damages. He did not find that we did not establish the fact of damages. He held that we did establish the fact. We did not establish the quantum. And when he looks at the quantum, he admittedly uses the wrong standard. Thank you very much, Your Honor. Thank you. I appreciate it. Thank you. We'll hear United States v. Gary James. May it please the Court, my name is David Gordon. I represent appellant Gary James. Hold on one second while we let the courtman clear out. The case is under seal. I don't know how that impacts your argument. If there's anything particularly sensitive, let us know and we'll figure out how to deal with it. Fine, Your Honor. Thank you. Mr. James was re-sentenced on the original charges in this case, which was conspiracy to import cocaine and money laundering conspiracy, to run consecutively through an 18-month sentence that had been previously imposed for his failure to appear for sentencing. The issue on appeal is whether the sentencing that was imposed was procedurally unreasonable and also substantively unreasonable. We submit that it was procedurally unreasonable and that the court did not properly calculate the guidelines by erroneously failing to give Mr. James credit for acceptance of responsibility and also for failing to state in open court at the time of sentencing the reason it was imposing the sentence that it imposed, which was 90 months consecutive to the 18-month sentence previously imposed. Was failure to award acceptance of responsibility points the only procedural error that you're urging on us? No. And failure to state in open court. Right. Those two. Those two. Normally, when somebody obstructs justice, the person does not get credit for accepting responsibility. The guideline says that. But the guidelines in Application Note 4 to 3E1.1 also states that in an extraordinary case, a person can also get acceptance of responsibility credit, even when one has obstructed justice. I cannot conceive of a case more extraordinary than this one. If this case is not sufficiently extraordinary, I can't imagine that any case is. While he was on supervision, he was arrested three times. He slipped off his bracelet. He absconded for three months. Why was it unreasonable for the district court to deny him acceptance of responsibility in light of those facts? He was a fugitive for two months. First of all, the arrest that he got while he was under supervision, while he was awaiting sentence, was so insignificant that the government never asked that his cooperation agreement be deemed to be violated. The government never asked that he be remanded. Wasn't that an assault? What was the assault? It wasn't an assault. It was harassment. An assault in the third degree? I thought maybe that's harassment. No, the conviction was for harassment. He had a drunk driving, an harassment, and a contempt for violating an order of protection involving his former fiancée. Clearly, he had a drinking problem. He had a driving problem. He had a drinking while driving problem. He had an anger management problem. And he had problems with his former fiancée. There's no question about that. But the fact that he was arrested while he was awaiting sentence for these things didn't trouble the government or the court. In fact, the court let him leave the country to go to Guyana to attend the funeral of his sister when there's no extradition treaty with Guyana. He could have stayed there. He could have stayed there. The evidence of his accepting responsibility was his immediate cooperation with the government, totally truthful, telling him everything, even telling the government about an attempt by the brother of a co-conspirator to have him continue participating in the drug conspiracy while he was out on bail. He told the government about that. The problem is, you know, if I used to be a district court judge, I probably would have given him points for acceptance. But you've got to convince us that the sentencing judge here was just so far out of the ballpark. He was. It was a judgment that no reasonable district court judge could make. He gave this defendant a greater sentence than all the people he cooperated against. Some of these defendants were involved with 150 kilos of cocaine. Mr. James was involved in recruiting a few mules in connection with three kilos of cocaine. Yet he got a sentence far greater than the people who were much more culpable than he was. And his cooperation was complete. Everybody he cooperated against had pleaded guilty except one person who absconded. Did you reserve that point for this appeal? What? The disparity. I did. I did raise the disparity as one of the issues. As one of the issues. But he. Did the district court address the disparity? The district judge didn't address any of the arguments that were raised for a downward variance. Not acceptance of responsibility, not disparity. All he said was. The only comment he made during the whole sentencing procedure was he absconded. And he was criminal category two. And he's never spent a day in jail. Which would be a reason to give a lighter sentence. The fact that he'd never been in jail before is a reason to give a sentence. The United States versus Michel. A reason to give a sentence below the guidelines. I was also a little confused, and I'll ask the government this as well, about what the district court understood on remand exactly he was doing. It looked to me like everyone agreed that the range was 108 months to 135 months. At one point the district court says I start at the top of the guidelines, 135. At another point he says, no, I'll start at 117 in the middle. And then he says, I'll start at the low end of the guidelines. This is on A130 and A131. And, I mean, there's confusion about how to deal with the 18 months, the consecutive and what was going to be concurrent. The judge expressed confusion on several occasions. It was clear what the court was supposed to do on remand from this court following the original sentence. What the judge was supposed to do is figure out the total appropriate punishment for the underlying offense and for the failure to appear. Figure out what the total punishment was. And since he had already imposed a sentence of 18 months on the failure to appear, which was not subject to the appeal, then figure out what the total punishment is and then subtract 18 months from that and impose a sentence on the underlying charge for the difference. That's what the judge was supposed to do. Both sides were in agreement that that was what the judge was supposed to do. The judge was confused as to what the guidelines were. He was confused as to whether he was going to do the top of the guidelines, the bottom of the guidelines. He never addressed any of the arguments as to why there should be a variance. He never addressed the argument that there should be downward departure based upon the military service. Mr. James had served on an aircraft carrier and had served in Iraq. Probation recognized that was a grant for downward departure. The probation department in the pre-sentence report recognized that, led it to the court. Probation didn't recommend the guideline sentence. Probation said we leave it to the court to determine whether there should be a downward variance pursuant to 3553A. The government conceded that although he violated the cooperation agreement, his cooperation was so significant that the judge might consider that as the basis for a downward variance. Given all these reasons why there should be a downward variance, the court never addressed any of it. The court never explained why he rejected the acceptance of responsibility, never gave any reason for why he was imposing a sentence that was within the guidelines, given the sentences imposed on other people, given the cooperation, given the expressions of remorse, given the post-defense rehabilitation clearly shown by Mr. James. At this recent, Mr. James had already been in jail for over five years. Now he's been in jail for over six years. He's been in jail for almost 75 months since he came back after he absconded. His absconding had nothing to do with this case. It had nothing to do with accepting responsibility. He absconded because he was depressed. He had to go talk to somebody. He slipped out of his bracelet, violated his curfew, and pre-trial services. The judge said he'd be remanded. And he had reason to fear that he'd be killed. One of the other cooperators, one of the people that Mr. James cooperated against, cooperated, and he was executed, a bullet in the back of his head. So when Mr. James was told that he was going to be remanded, immediately, what? Yes, it's definitely in the record. He fled because he feared for his life, not because he wasn't accepting responsibility. If he hadn't accepted responsibility, he would never have come back from Guyana. Did the district court address that at all? No, he didn't address anything. He didn't address anything. Just that he absconded. Basically, clearly, he would have gotten a sense of time served if he hadn't absconded. Maybe a minimal sentence and direct surrender to an institution, but probably time served given the other sentences that were imposed. He'd been out of jail for several years. He'd been awaiting sentence for several years. His cooperation was complete. He had no reason to run away. He ran away because he was afraid to be killed if he didn't. We'll hear from the government. Thank you. May it please the Court. If you'd like, you can press the button to your right and move the podium down. It may be a little more comfortable for you. May it please the Court. My name is Tanisha Payne. I'm an Assistant United States Attorney in the Eastern District of New York, and I represent the United States in this matter. The district court's sentence was procedurally and substantively reasonable, both as to the sentence itself and the procedures employed in arriving at the sentence. I would first like to draw the Court to three main points that I will refer to in my arguments with respect to procedural reasonableness. First, the plain error standard of review applies to this case because the defendant did not object to the district court's alleged failures to explain its reasoning for its sentence and to discuss the Section 3553A factors. Second, the mandate from this court to the district court was specific. On remand, the district court was ordered to first determine the total punishment appropriate in both cases and then offset that amount by the 18 months' imprisonment already imposed in the failure-to-appear case. Third, the proceeding at issue was a resentencing, at which the court heard essentially the same arguments it heard during the initial sentencing hearing. This is relevant because at the initial sentencing, the court stated that it had heard and considered the arguments as well as the relevant 3553A factors. Notably, this court applies a robust plain error standard in this context because it would have been easy for counsel and the defendant to object if they were dissatisfied with the court's explanations and reasoning. Ms. Payne, I'm troubled reading the transcript here about the confusion about what point the district court was starting from and the record's lack of any explanation for where the district court was beginning his analysis on the concurrent sentences before taking the 18 months off. As I mentioned to your adversary, to the defense counsel, everyone seems to agree that the range was 108 months to 135 months, that that was correct and the PSR didn't make a recommendation. But at page A130 of the hearing, the district court says, I'm starting at the top of the guidelines, as Mr. Gordon points out, that he deducted the 18 months from 135, that's the top of the range. The following sentence, after that's pointed out, he says, well, actually what I'll do is I'll start with 117 months, the low end of the guidelines, and then subtract 18 months, so it'll be 99. And then, I guess you point at that, that's the low end of the guidelines, but that's the midpoint is what you start to say. And then he says, well, if your intention is to sentence at the low end of the guidelines, that would start at 108. And then he changes again his starting point. And, you know, these are significant 17-month differences. This is a lot of time in jail that he's moving around in his calculus without offering any explanation about why. And so he ends up at the low end of the guidelines, where there's been an argument still that he should have varied below, given some of these arguments about the reasons that he gave for absconding. So he ends up starting at 108 and subtracts 18 months and ends up at 90. But he's gone from 117 months to 90 in the space of 20 lines, or 30 lines in the transcript without any explanation at all to the defendant who needs to spend this time in jail. Why is that procedurally correct? Why doesn't it raise questions even about substantive reasonableness? Well, Your Honor, I agree that the court, in my opinion, did evidence confusion as to the math that it was to apply as far as this court's mandate. I do think that the court understood. It's not just the math. At one point he says, I'm starting at the high end of the guidelines. Then he starts in the middle, and then he starts at the bottom. I think that the court's confusion was as to the mandate, not specifically as to the applicable guidelines range. In each case, though, he's subtracting 18 months, as was directed by the remand. It's the starting point that changes very significantly over the course of this brief colloquy. In being before him, my understanding of his confusion was the fact that he needed to first make a decision as to the appropriate total punishment, and I think that's where he initially had confusion. When I pointed out to the court that if your intention, which is what he said, was to sentence the defendant to the low end of the guidelines, then I said that we would be starting at the 108. So I do think that it was more so. But he starts out by saying, I'm starting at the top of the guidelines. Correct. But I think the slight issue is that I think the confusion from the court was that he was supposed to first determine not first do the subtraction, but to first determine the appropriate punishment for both cases. Well, he ends up going from 117 months to sentencing him to 90 without any explanation. That's obviously in the defendant's favor, but I'm troubled that I see no explanation for it. And he doesn't address... I mean, I take it you're arguing that he doesn't have to address more because this was a resentencing, and the fact that he absconded was established, and so he doesn't really have to say anything further. But, I mean, he has an affirmative obligation to explain his consideration of the 3553 factors, and I don't see that in the record here. How can I be comforted about his thought process here? Well, Your Honor, at the initial hearing in 2014, the district court did state on the record, although he did cooperate, he did violate the cooperation agreement. I have read the submissions, heard oral argument. I've considered the factors in 3553A. I just want to remind the court that these factors and these arguments were the same arguments that the defendant argued at the 2014 sentence hearing in its sentence submissions and the numerous objections to the pre-sentence report and again at the March 2018 hearing. So the court heard again these arguments, acknowledged that the court had again heard the defendant, and then proceeded to adopt the guidelines range recommended by the Department of Probation, which was the 108 to 135. Where did he explain anything about the adjustment for acceptance of responsibility that the defendant proposed? His explanation was after... The only explanation he gave was after counsel again was continuing to argue the acceptance of responsibility where he said, I've heard your point, and then adopted the guidelines range proposed by the probation. So he did acknowledge that he... I'm sorry, where exactly was that? That was... This is Appendix 130, when the court says, okay, you had your say. This is line 11, and then says that I find that the guidelines is 108 to 135, and that's what the guidelines is. But the first sentence was 186 months? No, 108 to 135. First time. I'm sorry, sir. The first time around in 2014, the sentence was 186 months, I think. That's correct. Total. Correct. So he went down to 100, from 186 to 108. Yes, and that was based on extensive, again, arguments, changes in the revised pre-sentence report where the defendant argued that the court considered a lower quantity of narcotics to attribute to the defendant. The government did not object, and the court accepted that. The new sentence of 108 months covered narcotics conspiracy involving two kilos, money laundering, and absconding. I believe it was three kilos, Your Honour. Three kilos. Yes. But he got more time than co-defendants who were responsible for considerably more drugs. There were, in some instances, but not in all. There were other defendants who were minor participants who were less culpable than this defendant. I also want to bring up that in the court's statement of reasons. There were defendants who had considerably larger quantities of drugs attributed to them who got less sentences. Yes, Your Honour. Give me a couple of examples. Some of my notes suggest that five years ago, five defendants, including two, received time served. That's correct. Is that correct? Yes. And then one who arranged for drug couriers to be sent to Jamaica also received time served, and one who worked as a driver received 70 months. Correct. That's with my notes. Does that seem correct? Yes. That's fine. Thank you. Thank you, Judge. And am I right that in the original sentencing, the judge thought that he was responsible and was held accountable for at least five kilos of cocaine, but on remand, the government, you all agreed that he should be responsible for only 3.1? Correct. So that also accounts in some part for the change in the sentence and the guidelines range, right? Correct. Thank you. And in addition, the district court's statement of reason established that the pre-sentence report was adopted without change and specifically the court indicated in his statement of reasons that the factors under 18 U.S.C. 3553A, submissions and argument by counsel and the defendant, defendant's extensive criminal record, their seriousness of the offense, deterrence to criminal conduct to protect the public from future crimes by this defendant, and the need for the sentence to be sufficient but not greater than necessary to achieve the aims of the statute. Remind me what his prior record was. His record included harassment, criminal contempt, driving under the influence, and... And that's an extensive criminal record? I just wanted to... Had he ever been incarcerated before? He had been, but a minimal incarceration date. How long? I believe it was... I don't believe that. I believe that he served, and I apologize, I don't have the specific time that he served, but it could have been between a day but definitely less than a year. I do know that he had a minimal amount of imprisonment prior to this case. Could I ask one final quick question, please? I understood that in the original motion to remand, when we first saw this case, you took the position that the district court had not really fulfilled the requirement of the statement in open court of the reasons for the sentencing. Is that right? It was specifically that the court had not... That there was confusion as to the guidelines range, not that he had not stated in open court his reasons. I see. And so your approach here, you think, is consistent with that. You believe everyone understood what the court was aiming at, despite what I've pointed out in the transcript. Yes. Standing before him in the courtroom, it appeared that the court did understand the applicable guidelines range. The only confusion was as to how this court had mandated that he carry that out as far as subtracting the 18 months. Even though he went basically from 117 months to 90 months. And my impression of that was not that he was starting there at his sentence, but that he was starting there with the subtraction of the 18 months and then was going to, you know, from there determine a sentence. There was confusion as to that, I agree. But in his words and responses to the parties, he stated his intention to sentence the defendant to the low end of the guidelines. And I reminded him of that. We started out saying the high end. You started out saying that... That's okay. I think I understand. Thank you. Thank you.  Thank you. Thank you. Judge Parker, in response to your question, he spent 45 days for contempt for violating an order of protection. That was while he was out on bail, after which he was allowed to go to Guyana. He was allowed... To go to Guyana. The only time he had ever served in jail was for a conduct occurring while he was released in this case for violating an order of protection. Do you agree that this is plain error? Yes. Also, the government says that the same arguments were made at the initial sentencing. That's not true. At the initial sentencing, there was a lower offense level. There were different guidelines. The defense lawyer at the initial sentencing never made an argument about acceptance and responsibility. I'm sorry. The original sentencing was a higher offense level because there were five jurors. You just said lower. I'm sorry. It was now lower because he shouldn't have been held responsible for drugs that occurred before he entered the conspiracy. Judge Parker, I understand the points you're making about the fashion in which, the cursory fashion in which the district court touched some of these bases, but I don't understand at this point how all this amounts to plain error. He's required to give his reasons. He didn't give any reasons at all. He did not give any reasons as to why he did not accept what were fairly strong arguments in favor of acceptance and responsibility. He just said, you know, the guidelines are underneath. He didn't say why he was rejecting the arguments in favor of acceptance and responsibility. No arguments were made at the original sentencing about post-defense rehabilitation. No arguments were made at the original sentencing about disparity. There were a lot of additional arguments that were made, and this was a resentencing, a total resentencing, not an amendment of the first sentencing. This is a totally new proceeding. I'm sorry. So all the disparity arguments were made then in that hearing? At the resentencing hearing, not in the original. Not at the original one. My notes say that some of the co-defendants or other people involved in the conspiracy were sentenced to time served. All right. Mohammed Hussein, he was responsible for 150 kilos. He got a three-level enhancement as a manager or supervisor. He laundered $71,500 intended to pay for the purchase of drugs not calculated in the guidelines. His guideline range was 235 to 293 months if he was in criminal category history one. He got time served one day. Okay. Dale McCreith was also responsible for 150 kilograms. He gave a firearm to a co-defendant, so he got a two-level enhancement for that. He was given a four-level enhancement as an organizer. His guideline range was 324 to 405 months if he was in criminal category one. He was also involved in selling cocaine since 1995, selling marijuana between 2009 and 2010, laundering money. He was also involved in retagging and reselling cars. This is Mr. McCreith? Yes. And he got? My notes say time served. Time served, yes. And time served was how much? How much time had he served? Do you have an order of magnitude? Again, I think a day. Day? Yes. Wayne Thompson? So this was, Judge Johnson may not have handled this proceeding to the queen's taste, but why was this plain error? Well, also, it was far greater than necessary to meet the objectives of 3553A2. You don't let the guy stay out on bail and leave the country and then sentence him to nine years in jail because he absconded because his life was in danger. So how does it meet the, I can't get you on the first or second problem, how does it meet the third problem of plain error? It was plain, it was error. You have to give some reason for your sentence, and the judge didn't. Thank you, Mr. Daniel. We'll reserve the decision. The final case is on submission. Accordingly, I'll ask the clerk to adjourn.